**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**ALAN C. LOLLIS,**

Plaintiff,

v.

**LT. OFFICER G. ROBERTS, et al.,**

Defendants.

CASE NO. 3:25 CV 207

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Currently pending before the Court in this § 1983 civil rights action is Defendants Correction Lt. Geoffrey Roberts, Correction Lt. Joshua Mulinix, and Institutional Inspector Michael Jenkins's Motion for Summary Judgment. (Doc. 12). *Pro se* Plaintiff Alan C. Lollis opposes. (Doc. 15). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons below, Defendants' Motion is granted.

## BACKGROUND

Plaintiff, a prisoner at Toledo Correctional Institution, brings this suit based on a use of force incident on April 3, 2024.

Pursuant to a shakedown on the date in question, Plaintiff was found in possession of various suspected drugs and tobacco. (Doc. 12-3, at 3). Officers took Plaintiff to a "strip out cell" because he was suspected of concealing additional contraband, specifically a mini cell phone, in his anal cavity. *Id.* Plaintiff was directed by staff to submit to a visual body cavity search. *Id.* This process "involves bending at the waist and separating [one's] buttocks to allow staff to

visually inspect the rectal area and anal cavity for contraband." *Id.* This method replaced a prior method of search called "squat and cough." *Id.*

The entire interaction is depicted on body camera videos from various correctional officers.[1] The shift captain, Major Wines was contacted; he authorized use of force procedures if Plaintiff refused to cooperate. (Doc. 12-3, at 3).[2] Crisis Intervention Team Negotiator Peppers attempted to deescalate the situation and convince Plaintiff to comply. *Id.*

Plaintiff refused to comply with the officers' specific instructions; he was both physically and verbally noncompliant, stating repeatedly that he would not show officers his anal cavity as they requested. *See id.*; *see also generally* Exhibit 6 (body camera videos). Plaintiff also stated he was suicidal, should be put on suicide watch, asked for clothing, and said he wanted to see someone from mental health. He repeatedly stated he would not comply with the officers' direction to spread his buttocks. He repeatedly insisted he would "squat and cough" or "bend forward", while making those motions quickly and repeatedly. He argued over officers' attempts to explain to him what he needed to do to complete the visual cavity inspection. *See* Ex. 6, Lollis,_Alan-630679-3.mp4, at 0:00-4:42.

---

1. Defendants' Exhibit 6 consists of body camera videos depicting the incident. As relevant here, in (overlapping) chronological order, these are: Lollis,_Alan-630679-3.mp4 (covering timestamps 20:03:56-20:16:48), Lollis,_Alan-630979.mp4 (covering timestamps 20:03:55 to 20:16:40); Lollis,_Alan-630679-2.mp4 (covering timestamps 20:16:48-20:25:58); Lollis,_Alan-630679.mp4 (covering timestamps 20:27:08-20:35-25); Lollis,_Alan-630679-4.mp4 (covering timestamps 20:18:01-20:50:51).

2. ODRC has policies regarding Behavioral Intervention/Use of Force and use of a Crisis Intervention Team before any use of force when possible. *See* Doc. 12-3, at 1-5; Doc. 12-7 (ODRC Policy 63-UOF-01, Behavioral Intervention/Use of Force); Doc. 12-6 (ODRC Policy 71-SOC-11, Crisis Intervention Team). Generally, these policies direct staff to "first seek to gain compliance with staff directives by first utilizing interpersonal skills and effective behavioral intervention techniques to de-escalate situations when possible and safe to do so", employ crisis intervention team members or others to help resolve the situation, and warn the prisoner that planned force may have to be used and allow the prisoner "a final opportunity to comply with the order." (Doc. 12-3, at 1-2).

Roberts, after giving Plaintiff further warning, deployed a short burst of oleoresin capsicum ("OC") spray into the cell in an attempt to gain compliance. (Doc. 12-3, at 3); [3] Ex. 6, Lollis,_Alan-630679-3.mp4, at 4:43. Plaintiff's back was turned toward the spray. *See id*. Per Roberts, "as a result, it had little to no effect." (Doc. 12-3, at 3). Still, the video depicts Plaintiff coughing in response; he stated he had asthma and bronchitis and needed to see a doctor. (Ex. 6, Lollis,_Alan-630679-3.mp4, at 4:49-5:15). In any event, he continued to verbally engage with the officers.

Following the use of the OC spray, officers continued to try to gain Plaintiff's compliance through verbal negotiation but remained unsuccessful. *See id.* at 4:45-6:18. During this time, Plaintiff continued to state he would not comply with the direction to spread his buttocks and argued with the correctional officers about what constituted compliance. Roberts then authorized Mulinix to use a Tactical Compact Pistol, or pepper ball gun, to launch OC powder at Plaintiff's legs. (Doc. 12-3, at 3).[4] Just before doing so, Roberts gave Plaintiff a final directive to comply. (Ex. 6, Lollis,_Alan-630679-3.mp4, at 6:14-:15). Mulinix launched the OC powder three times, with a pause between each deployment, while officers continued to direct Plaintiff to comply and Plaintiff continued to loudly argue and refuse. (Doc. 12-3, at 3); (Ex. 6, Lollis,_Alan-630679-3.mp4, at 6:18-8:00). Roberts then deployed a second burst of OC spray to Plaintiff's face after giving another final warning to comply. (Ex. 6, Lollis,_Alan-630679-3.mp4, at 7:54-8:00).

---

3. Roberts asserts this was authorized by ODRC policy 63-UOF-01, regarding use of force. (Doc. 12-3, at 3).

4. Roberts explains that OC spray is typically effective only at close range, whereas a Tactical Compact Pistol "can accurately deliver OC powder from a further and safer distance" and provides less risk of blowback or unintended exposure. (Doc. 12-3, at 2).

A second negotiator, Shift Responder Officer Renwand was contacted and attempted to deescalate and gain Plaintiff's compliance. (Doc. 12-3, at 3). Despite attempts over more than seven minutes, officers remained unsuccessful in gaining Plaintiff's compliance with their directives. *See generally* Ex. 6 (body camera videos).

Given Plaintiff's agitated state and failure to comply, officers determined that the use of a body scanner tool would "create a high risk of injury to staff, require the utilization of significant staff resources, and increase[] the risk of damage to the equipment." (Doc. 12-3, at 4). Officers were concerned about the risks of Plaintiff being unrestrained. *Id.* Roberts specifically noted he was familiar with Plaintiff's previous involvement in assaults on staff and other inmates. *Id.*

Major Wines subsequently authorized Plaintiff's removal from the strip out cell and into a dry cell where he could be monitored "for the expulsion of contraband." *Id.*; *see also* Ex. 6, Lollis,_Alan-630679.mp4, at 5:15-:20 (informing Plaintiff he was being placed "on dry cell per Captain"). Prior to being placed in the dry cell, Plaintiff was taken to medical and assessed by a nurse. (Doc. 12-3, at 4). Plaintiff refused to have his vitals taken and "voiced no statement or concern." (Doc. 12-4, at 18). The nurse noted circular wounds on Plaintiff's left leg and right buttock, which were cleaned, treated with triple antibiotic ointment, and covered with band aids. *Id.* Because Plaintiff had stated he was suicidal, he was then placed on constant watch. (Doc. 12-3, at 4).

Roberts and Mulinix (among others) completed Use of Force Reports. *See* Doc. 12-4, at 2-11; Doc. 12-3, at 4 ("All staff involved in the UOF incident wrote UOF reports."). Plaintiff completed an Inmate Use of Force Statement, on which he wrote "I'm suicidal, this is harassment." (Doc. 12-4, at 12). Someone wrote "Constant Watch" at the bottom of this form. *Id.* Peppers and Renwand also completed Intervention Reports. *Id.* at 18-20.

Plaintiff was issued a conduct report for disobedience of a direct order based on his failure to follow the strip out procedures. (Doc. 12-5, at 5). The conduct report was ultimately withdrawn due to a Rules Infraction Board hearing not being held within the time frame set by policy. (Doc. 12-3, at 5); (Doc. 12-5, at 7).

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Excessive Force

Plaintiff alleges Lieutenants Roberts and Joshua Mulinix used excessive force in violation of his Eighth and Fourteenth Amendment rights when they used OC spray and the pepper ball gun against him. *See* Doc. 1, at 6, 8-9.[5] Roberts and Mulinix move for summary judgment on this claim, asserting they are entitled to qualified immunity because Plaintiff cannot establish a constitutional violation, much less a clearly established constitutional violation. (Doc. 12, at 23, 24-29). As explained below the Court agrees.

To state a claim under 42 U.S.C. § 1983, a plaintiff must identify the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Plaintiff brings his claims under the Eighth Amendment.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Supreme Court has long held that the Fourteenth Amendment incorporates the Eighth Amendment's ban on "cruel and unusual punishments" against the States. *See Robinson v. California*, 370 U.S. 660, 666-67 (1962). The Court has also long held this ban does not just cover the formal "punishment" that a state court metes out to criminal defendants. The ban also applies to informal harms that prison officials inflict on convicted prisoners during their terms of

5. Plaintiff also alleges the use of force violated his Equal Protection rights under the Fourteenth Amendment. (Doc. 1, at 8). Because the claim more properly sounds in excessive force, the Court addresses it as such.

incarceration. The Eighth Amendment thus regulates, *inter alia*, the force that prison guards use on prisoners. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). The ban on cruel and unusual punishments prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 319); *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). "The Supreme Court has long held that the Fourteenth Amendment incorporates the Eighth Amendment's ban on 'cruel and unusual punishments' against the States." *Johnson v. Sootsman*, 79 F.4th 608, 615 (6th Cir. 2023) (citing *Robinson v. California*, 370 U.S. 660, 666–67 (1962); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463, (1947) (plurality opinion)).

The "unnecessary and wanton infliction of pain" requirement "has objective and subjective components, both of which follow from the Eighth Amendment's text." *Id.*

> Objectively, harm to a prisoner must rise to a sufficiently serious level because the Eighth Amendment prohibits only "cruel and unusual" deprivations, not just uncomfortable or "even harsh" ones. *Rhodes*, 452 U.S. at 347, 101 S.Ct. 2392; *see Phillips*, 14 F.4th at 534. Subjectively, harm to a prisoner must result from a prison official's sufficiently volitional actions because the Eighth Amendment bars only willful conduct that "inflict[s]" "punishment," not accidental conduct that causes injury. *See Phillips*, 14 F.4th at 535 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

*Id.*

"As a subjective matter . . . prisoners who challenge a correctional officer's use of force must prove more than that the officer acted with 'deliberate indifference' to whether the force was necessary (the type of intent that prisoners must prove to challenge their conditions of confinement or medical care)." *Id.* at 616 (citing *Hudson*, 503 U.S. at 5-6). "The Court has instead described the 'core judicial inquiry' in this use-of-force context as distinguishing between force used in a 'good-faith effort to maintain or restore discipline' and force used 'maliciously and sadistically to cause harm.'" *Id.* (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37

(2010)); *see also Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) ("[I]n the prison context, good faith use of physical force may be necessary to maintain prison security and discipline[.]"). "Only the latter kind of force—force exerted maliciously and sadistically to inflict pain—violates the Eighth Amendment." *Johnson*, 79 F.4th at 616. "So even if an officer uses force because of an 'unreasonable' belief that it is necessary to restrain a prisoner, the officer does not violate the Eighth Amendment." *Id.* (quoting *Whitley*, 475 U.S. at 324). The Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force" so long as the use of force is not the type of force that would be "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). "The negligent use of force—even the reckless use of force—does not establish an Eighth Amendment claim; [Plaintiff] must prove the malicious use of force for the exclusive purpose to inflict pain." *Johnson*, 79 F.4th at 621.

> To decide whether a jury could find that an officer acted with this malicious intent, the Supreme Court has identified several factors to consider: What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer take any actions designed to reduce the required amount of force?

*Id.* at 618. Courts also approach such claims with deference to avoid "unreasonable *post hoc* judicial second-guessing" of officers' conduct. *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2008); *see also Johnson*, 79 F.4th at 618 ("[W]hile judges may review an encounter by slowing down, pausing, and replaying a video, officers have no such luxury. They must make quick decisions in the heat of the moment.").

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is an affirmative defense; once a defendant raises it, the burden shifts to the plaintiff to demonstrate (1) the defendant's acts violated a constitutional right, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). A "clearly established right" for the purpose of determining whether a public official is entitled to qualified immunity "is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A defendant bears the initial burden of putting forth facts that suggest that he was acting within the scope of his discretionary authority." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 568 (6th Cir. 2013). Once a defendant has done so, "[t]he burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (citation and internal quotation omitted); *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022) ("The plaintiff bears the burden of showing that the right was clearly established" and, to meet such a burden, "must provide on-point caselaw that would bind a panel of [the Sixth Circuit]."); *see also, e.g.*, *Campbell v. Hines*, 2013 WL 7899224, at *4 (6th Cir.) ("[T]he district court properly declined to address the merits of Campbell's equal protection claim, because he failed to respond to the defendants' argument that they were entitled to qualified immunity.").

Upon review, in accordance with the law as set forth above, the Court finds Defendants are entitled to summary judgment on Plaintiff's excessive force claim. Plaintiff has not established a dispute of fact regarding the subjective component of such a claim. The nature of the threat at issue here was the introduction of potential contraband into a prison. The videos reflect the officers made numerous efforts to deescalate and gain Plaintiff's compliance without

the use of force and provided him repeated opportunities to comply. *See Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (summary judgment granted where videotape demonstrates that inmate disobeyed repeated direct orders before the use of pepper spray). The force used was minimal, proportional to the threat at issue, and designed to gain compliance (two short bursts of OC spray at separate times and three pepper balls). *See Johnson*, 79 F.4th at 620 ("[W]e have repeatedly described the use of a taser or pepper spray as a proportional level of force in response to a prisoner's refusal to follow orders, including an order to accompany an officer."). Further, Plaintiff's injuries were minor, requiring only antibiotic ointment and band aids. *See, e.g.*, *Yettaw v. Morgan*, 2025 WL 1805287, at *4 (W.D. Mich.) (finding "minor injuries" from a pepper ball launcher including small bruises and a small amount of bleeding requiring band aids "undercuts any suggestion that [the officer] acted with malevolent intent.").[6]

In his opposition brief, Plaintiff seemingly argues that he did comply with the officers' directives. *See* Doc. 15. But "even if an officer uses force because of an 'unreasonable' belief that it is necessary to restrain a prisoner, the officer does not violate the Eighth Amendment." *Johnson*, 79 F.4th at 616 (quoting *Whitley*, 475 U.S. at 324). Roberts's Declaration demonstrates he subjectively believed Plaintiff had not complied. (Doc. 12-3, at 3-4). The body camera footage confirms this. And the evidence Plaintiff cites does not create a question of fact regarding his compliance with the officers' orders or officers' subjective beliefs.

6. Plaintiff does not – in his Complaint or his opposition brief – assert any other injury (such as breathing difficulty) as a result of the use of chemical agents. *See* Docs. 1, 15. Moreover, as Defendants point out, courts have found the temporary discomfort associated with the use of chemical agents to not amount to a serious injury. *See, e.g.*, *Jennings*, 93 F. App'x at 725 (finding use of OC spray where individual was not "in respiratory distress of any sort; he merely was uncomfortable in the ordinary fashion of persons exposed to pepper spray" supported conclusion that no Eighth Amendment violation occurred).

First, to the extent Plaintiff points to video evidence of his purported compliance *after* the OC spray or pepper ball gun was used, such evidence is not relevant to whether the force was reasonable at the time it occurred. *See* Doc. 15, at 2 (citing Ex. 6, Lollis,_Alan-630679-2.mp4, at 1:31, 3:27, and 5:45).

Second, to the extent Plaintiff argues the videos depict that he bent forward, or "squatted and coughed," this does not create a question of fact regarding his compliance with the officer's directives, which were (consistent with their policy) for him to bend forward and then spread his buttocks. *See*, e.g., Doc. 15, at 3 (noting that in Lollis,_Alan-630979.mp4 at 3:11 and 4:39 and in Lollis,_Alan-630679-2.mp4 at 1:31, Plaintiff can be seen squatting and coughing); *id.* at 2 ("Thru out [sic] the whole incident you can clearly see me squat and cough and plead with the officers that I don't have anything on me or in me."); *id.* at 3 (stating that at 2:00, 3:21, and 4:18, in Lollis,_Alan-630679-3.mp4, Plaintiff can be seen squatting and coughing or bending over). Defendants submit evidence that the visual body cavity search policy required an inmate to "bend[] at the waist and separate[e] [one's] buttocks to allow staff to visually inspect the rectal area and anal cavity for contraband." (Doc. 12-3, at 3). Plaintiff presents no evidence to the contrary. And the video depicts Plaintiff did not comply with this procedure before officers' use of OC spray and pepper balls.

Further, in his opposition brief, Plaintiff argues that "[t]o avoid it all, all they had to do was what they did in the end. Body scanner and dry cell." (Doc. 15, at 3). But even if other alternatives were available, the applicable standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7. As explained above, even viewing the evidence in the light most favorable to Plaintiff, the force used here falls into the former category. The availability of other force

alternatives is irrelevant to the analysis. *See Jones v. Slater*, 2024 WL 4485575, at *5 (E.D. Mich.) ("The standard is not whether any less force could have accomplished defendants' legitimate goals."), *report and recommendation adopted*, 2024 WL 4349176.

The force used here was simply not the sort of force "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). Nor could any reasonable jury conclude Defendants used force maliciously and "for the exclusive purpose to inflict pain." *Johnson*, 79 F.4th at 621; *Jennings*, 93 F. App'x at 725 (finding "corrections officers did not violate [the plaintiff's] Eighth Amendment rights because the force used was applied in a good-faith effort to maintain or restore discipline, not to maliciously cause pain. The videotape squarely demonstrates that [the plaintiff] disobeyed repeated direct orders prior to the use of pepper spray.") (citation omitted); *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) ("We found no Eighth Amendment violation where a prisoner was sprayed with pepper spray after repeatedly disobeying orders to exit the shower. Indeed, in numerous other cases we have likewise concluded that the use of chemical agents against recalcitrant prisoners did not violate the Eighth Amendment.") (citation modified).

Finally, Plaintiff has not satisfied his burden, to overcome qualified immunity, of "showing that the right [at issue] was clearly established" by "provid[ing] on-point caselaw that would bind a panel of [the Sixth Circuit]." *Bell*, 37 F.4th at 368.

The Court therefore finds Defendants are entitled to qualified immunity and summary judgment on Plaintiff's Eighth Amendment / Fourteenth Amendment excessive force claim.[7]

---

7. Defendants also contend that to the extent Plaintiff brings any claim regarding Defendants' decision to place him in a dry cell, he similarly has not established an Eighth Amendment violation relative thereto. (Doc. 12, at 23). The Court finds Plaintiff did not bring any such claim here. *See* Doc. 1, at 1 (describing being "moved to segregation" following the incident) and Doc. 1, at 6-9 (claims for relief not mentioning dry cell or segregation, but focusing on alleged

Due Process / Equal Protection

Plaintiff further brings Fifth and Fourteenth Amendment due process claims based on alleged violations of institutional policies. He alleges all Defendants failed to comply with Ohio Administrative Code § 5120-9-03 and 5120-9-01 and Inspector Jenkins failed to conduct a use of force investigation. (Doc. 1, at 6-9). Defendants contend Plaintiff cannot establish a due process claim based on a violation of policy. (Doc. 12, at 23-24). In response, Plaintiff simply restates his allegation that Jenkins "violated [his] Fifth Amendment [sic] when he failed to investigate this use of force, file his use of force (Warden) Report to the Warden that would have organized a use of force hearing as set forth in administrative rules." (Doc. 15, at 4).

> The Fourteenth Amendment's Due Process Clause says that States may not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. This text requires plaintiffs to establish several things to make out a due-process violation. They must identify a "life, liberty, or property" interest that falls within the clause's reach. *Id.* They must show that state actors have "deprive[d]" them of this interest. *Id.* And they must prove that these actors did not provide the "process" that was "due" for this deprivation. *Id.*

*McClendon El v. Washington*, 144 F.4th 900, 904 (6th Cir. 2025).

---

excessive force and failure to follow use of force procedures and investigation). Indeed, in his opposition brief, Plaintiff states: "To avoid it all, all they had to do was what they did in the end. Body scanner and dry cell" and states he "begged to be placed on dry cell"" (Doc 15, at 3) (capitalization altered). To the extent Plaintiff brought such a claim, Defendants are correct that he has not established a claim based on cell conditions. *See Farmer v. Brennan*, 511 U.S. 825, 828-29 (1994) (to state a claim that prison conditions violate the Eighth Amendment under § 1983, an inmate must show prison officials acted with "deliberate indifference" to the inmate's health or safety). To establish such deliberate indifference, the prisoner must show he was deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions that are restrictive or even harsh, but are not cruel and unusual under contemporary standards, are not unconstitutional. *Id.*; *see also Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012) ("Harsh and uncomfortable prison conditions do not automatically create an Eighth Amendment violation."). Plaintiff has presented no evidence from which a reasonable jury could conclude he was deprived of the "minimal civilized measure of life's necessities" by being placed in the dry cell. *Rhodes*, 452 U.S. at 347.

Claims under § 1983 can only be brought for "deprivation of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Thus, allegations such as Plaintiff's which hinge solely on violations of ODRC policies and procedures fail to state a due process claim under § 1983. *See Alexander v. Vittitow*, 2017 WL 7050641, at *2 (6th Cir) (finding allegations of violations of Michigan Department of Corrections policies "fail to state a due process claim under § 1983") (citing *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) ("[W]e have long recognized that a mere error of state law is not a denial of due process.")); *see also Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007) ("Allegations of state law or state constitutional violations will not support a § 1983 claim. Similarly, a § 1983 claim may not be based upon a violation of state procedure that does not violate federal law.") (internal citations omitted); *McVeigh v. Bartlett*, 1995 WL 236687, at *1 (6th Cir.) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest).

Moreover, to the extent Plaintiff asserts a failure-to-investigate claim, the Sixth Circuit has held there is no constitutionally protected due process right to effective prison grievance procedures. *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003) (citing *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)).

Official Capacity Claims

Defendants also contend that any official capacity claims against them for monetary damages are barred by Eleventh Amendment/sovereign immunity. (Doc. 12, at 30). Plaintiff presents no argument in opposition, and the Court agrees Defendants are correct on this point and Defendants are immune from such official capacity claims. *See, e.g.*, *Morgan v. Bd. of Prof.*

*Resp. of the Supreme Ct. of Tenn.*, 63 F.4th 510, 518 (6th Cir. 2023) ("Eleventh Amendment sovereign immunity generally shields states from individuals suing them in federal court unless states waive their immunity or Congress removes it by statute.").

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 12) be, and the same hereby is, GRANTED, and it is

FURTHER CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3) that an appeal from this decision could not be taken in good faith.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 8, 2026